UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, )
)
    Plaintiff, )
)    Case No. 03 C00065
    v. )
)    Judge Bucklo
)
AON CORPORATION AND AON RISK )    Magistrate Judge Bobrick
SERVICES OF MISSOURI, )
)
    Defendants. )

## NOTICE OF AON'S MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on Wednesday, September 10, 2003, at 9:30 a.m. or as

soon thereafter as counsel may be heard, we shall appear before the Honorable Judge Elaine E.

Bucklo, Room 1903 at the U.S. District Courthouse located at 219 South Dearborn Street,

Chicago, Illinois, and then and there present for hearing **AON'S MOTION FOR SUMMARY**

**JUDGMENT**, a copy of which, along with the Memorandum in Support of Aon's Motion for

Summary Judgment is hereto and herewith served upon you, at which time and place you may

appear if you see fit.

Dated: August 22, 2003         Respectfully submitted,

                    AON RISK SERVICES OF MISSOURI,
                    INC. AND AON CORPORATION

                    By: *Laura L. M. Nally*
                        One of their attorneys

33961v1

Gary M. Elden
David E. Plunkett
Laura K. McNally
Patrick R. Malone
Grippo & Elden
227 W. Monroe, Suite 3600
Chicago, IL 60606
Phone: 312/704-7700

Douglas R. Stevens
R. Bruce Slocum
Aon Center
200 East Randolph Street, 8th Floor
Chicago, IL 60601
Phone: 312/381-5155

33961v1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 03 C00065 |
| v. | ) ) | Judge Bucklo |
| | ) ) | Magistrate Judge Bobrick |
| AON CORPORATION AND AON RISK SERVICES OF MISSOURI, | ) ) ) | |
| Defendants. | ) ) | |

## AON'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COUNTS I, II, III, IV AND V

Defendants Aon Corporation and Aon Risk Services of Missouri, Inc. (collectively "Aon") hereby move for summary judgment against Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA ("NU") on all of NU's claims against Aon. Aon is entitled to summary judgment as a matter of law.

1.  Aon is entitled to summary judgment on each of NU's claims, except the contribution claim, Count V, because each claim is barred by res judicata (see Section I of the attached Memorandum in Support of Aon's Motion for Summary Judgment ("Memorandum in Support")).

2.  Aon is entitled to summary judgment on each of the negligence counts, Counts I and II, because, in addition to being barred by res judicata, Aon owes no duty to NU as a matter of law and therefore there is no breach of that duty (see Memorandum in Support Section II).

3.  Aon is entitled to summary judgment on the Missouri statutory count, Count III, and the New York statutory Count, Count IV, because, in addition to being barred by

33881v1

res judicata, neither statute is applicable in this case (see Memorandum in Support Sections III and IV).

        4.      Aon is entitled to summary judgment on the AIG's claim for contribution, Count V, because, as a matter of law, Aon is not liable to AIG for contribution.

        5.      Filed in support of this motion is Aon's Memorandum In Support of Aon's Motion for Summary Judgment and the accompanying exhibits.

Dated: August 22, 2003           Respectfully submitted,

                              AON RISK SERVICES OF MISSOURI, INC. AND AON CORPORATION

                              By: _____
                              One of their attorneys

Gary M. Elden
David E. Plunkett
Laura K. McNally
Patrick R. Malone
Grippo & Elden
227 W. Monroe, Suite 3600
Chicago, IL 60606
Phone: 312/704-7700

Douglas R. Stevens
R. Bruce Slocum
Aon Center
200 East Randolph Street, 8th Floor
Chicago, IL 60601
Phone: 312/381-5155

AUG 2 / 2003

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 03 C00065 |
| v. | ) ) ) | Judge Bucklo |
| AON CORPORATION AND AON RISK SERVICES OF MISSOURI, | ) ) ) | Magistrate Judge Bobrick |
| Defendants. | ) ) | |

FILED

AUG 2 2003

MICHAEL W. ____S
CLERK, U.S. DISTRICT COURT

### AON'S MEMORANDUM IN SUPPORT
### OF ITS MOTION FOR SUMMARY JUDGMENT

The issues in this case were recently tried to judgment in Illinois state court, resulting in 266 Findings of Fact and Conclusions of Law, 76 pages long, uniformly against National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NU") and uniformly in favor of Aon Risk Services of Missouri ("ARS") and Aon Corporation (collectively "Aon"). (Findings of Fact, Ex. A.) NU, Aon Corporation, and ARS were all defendants in the prior case. The findings, as well as NU's positions in the prior action, combine to eliminate all material issues of fact in this litigation. Only legal disputes remain. Aon therefore asks this Court to rule on those remaining legal issues, which should lead to summary judgment in favor of Aon and ARS.

### STATEMENT OF FACTS

I. **Background of the Dispute**[1]

Aon Corporation is a holding company for various operating subsidiaries, including ARS. (Statement of Undisputed Facts ("SUF") ¶ 1.) ARS, a retail broker of insurance, acted as the broker of record for Hicks, Muse, Tate & Furst ("Hicks Muse"), and its subsidiary, International Wire Group ("IWG"). (SUF ¶ 2.) ARS sent an application for insurance (known as a

---

[1] A more complete statement of the dispute between the parties is set forth in the Statement of Undisputed Material Facts.

"submission") to $NU^2$, which issued the two umbrella insurance policies at issue in this case covering the two annual periods beginning April 1, 2000 and ending April 1, 2002. (SUF ¶ 3.)

IWG and its subsidiaries and predecessors manufactured water inlet hoses for washing machines manufactured by Whirlpool Corporation and General Electric Company (collectively, the "OEMs") from the 1950s through the mid-1990s. (SUF ¶ 4.) Some of these hoses proved defective, causing damage to homeowner properties and resulting in subrogation claims against IWG by homeowner insurance carriers. (SUF ¶ 5.)

Prior to the inception of the NU policies, the number of hose claims appeared to be down from prior years, and at a steady level, and the potential exposure from such claims was below IWG's self-insured retentions and therefore not reaching into IWG's primary insurance layers. (SUF ¶ 37.) At that time, IWG believed that the number and dollar value of claims would likely go down in the future. (SUF ¶ 38.)

This changed on June 4, 2001, when State Farm filed suit as subrogee of homeowners against IWG and others alleging damages in excess of $20 million for hose claims. (SUF 39.) IWG learned about the State Farm claims on June 11, 2001, and thereafter notified NU of the new hose claims and the potential that they might reach NU's coverage layer. (SUF ¶ 40.)

In July 2001, NU's claims-handling sister company, AIG Technical Services, Inc. ("AIGTS"), began investigating whether NU should deny coverage on the basis that the applications ARS had submitted to NU could be the basis of a rescission claim alleging material misrepresentations and omissions, and/or whether it could give rise to defense to coverage under the doctrine of known loss. (SUF ¶¶ 41-42.) Following its investigation, NU repeatedly told Aon and IWG that the coverage issues had been resolved. (SUF ¶ 43.) Thereafter, NU assumed the defense of the hose claims from IWG and otherwise asserted rights under the policies. (SUF ¶ 44.)

---

[2] In the Findings of Fact (Ex. A), Judge Hall referred to NU by the name of its corporate parent, "AIG." Ex. A.

After making statements and acting in a manner that indicated that it would provide coverage for the State Farm hose claims, AIGTS sent IWG a letter denying coverage on January 29, 2002. (SUF ¶ 46.) Prior to that date, NU had never sent a reservation of rights letter disputing coverage to IWG or Hicks Muse. (SUF ¶ 47.)

## II.    The State Court Litigation

### A.    The Parties' Claims

On February 1, 2002, not yet having received the January 29 letter (which used the wrong state abbreviation for Missouri and was therefore mailed to the wrong state), IWG sued NU and Aon in Cook County Circuit Court, seeking judgment declaring that NU was obligated to provide indemnification and defense to IWG with respect to all hose claims during the coverage periods of the NU policies, (SUF ¶ 48,) and also seeking injunctive relief requiring NU to defend hose claims. (SUF ¶ 49.) In the alternative, IWG claimed that Aon breached its duties in failing to obtain coverage for the hose claims.

In response, NU asserted counterclaims based on alleged material misrepresentations by Aon and/or IWG in the two submissions:[3]

> 25. AON Risk did not disclose in the submission materials it prepared . . . the existence of the indemnity agreements IWG entered into with the OEMs . . . . National Union issued Policies with certain terms regarding the existence of indemnitees without knowledge of the Agreements. National Union would not have written the Policies if the existence of the agreements was disclosed. (SUF ¶ 51.)
>
> 26. IWG and/or Hicks Muse made certain misrepresentations in the submission materials regarding the extent of the hose claims. . . . National Union's underwriter viewed the omission of the Agreements as material. The Policies would not have been issued if the existence of the agreements and/or the extent of the washing machine hose claims was disclosed. (Id.)
>
> 49. Upon information and belief, Hicks Muse, IWG and their brokers and agents deliberately and intentionally omitted material information regarding the extent

---

[3] Emphasis added throughout.

33949v1

and nature of the underlying hose claims and the existence, terms and conditions of the Agreements. (Id.)

50. Upon information and belief, the intentional failure and omission by Hicks Muse and/or IWG and/or their agents to disclose all hazards, including those referenced in the Agreement as of the inception dates of the Policies, constitutes a breach of the Policies. (Id.)

51. National Union therefore seeks a declaration that the intentional omission of material information in the insurance application/submission process regarding the extent and nature of the underlying hose claims by Hicks Muse and/or IWG and/or their agents constitutes a material misrepresentation. As such, National Union should be allowed to void the Policies. (Id.)

52. National Union seeks a declaration that the intentional omission of material information in the insurance application/submission process by Hicks Muse and/or IWG and/or their agents precludes coverage for IWG as an additional insured as well as precludes enforcement by Hicks Muse and/or IWG of the SEPARATION OF INSUREDS provision in the Policies. On information and belief, IWG provided information to the broker hired by Hicks Muse about the defective hose claims which it knew to be false and misleading. (Id.)

In addition to these claims, NU asserted the following affirmative defense based on the alleged misrepresentations:

Nineteenth Affirmative Defense: IWG's claim is barred because of IWG and/or its agents' material misrepresentations and omissions in the insurance applications/submissions for the Policies." (Id.)

## B.    NU's Admission That the Operative Facts Here Have Already Been Litigated

On the eve of trial, NU attempted to add a cross-claim against Aon that closely tracked its claims in this action. The Court refused to allow amendment on the ground that it was untimely filed.[4] (SUF ¶ 52.) NU made clear during argument on the issue that the operative facts already at issue in the state court action were the same as in those in any claim against Aon:

---

[4] THE COURT: With respect to the motion to file the cross-claim by AIG National Union against AON, the Court will deny that motion. It is apparent that there's a lot involved, and that's why the briefing and arguments that the Court has received concerning the nature of such a filing of a cross-claim and the nature of this possible action by AIG against AON, the scope of that action, what might be involved in it, have been very useful to the Court in order for the Court to exercise its discretion. It is literally the day before trial, and for all of the reasons

33949v1

As we discussed before, our cross-claim against AON follows and mirrors the allegations that are pled by IWG against AON. The essential issues here are the same, the facts are the same. We've had 50 depositions on these issues. They've had their own expert Mr. Kensicki who has opined and said he's prepared to provide opinions as to the standards and practices and procedures of a broker submitting submissions to insurance companies.

(SUF ¶ 53.)

## C.    **The Trial and Judgment**

Trial commenced November 4, 2002 and continued through January 31, 2003. (SUF ¶ 54.) On July 24, 2003, the state court issued its 76-page ruling, together with 266 Findings of Fact and Conclusions of Law. (SUF ¶ 55.) It was a complete victory for Aon and a complete loss for NU, which then had to pay IWG its reasonable attorneys' fees. (SUF ¶¶ 55-59.) The court ruled on multiple, alternative grounds that NU was obligated to defend and indemnify IWG for the hose claims during its policy periods. (SUF ¶ 56.) As to Aon, the Court granted its Motion for Directed Finding and Order of Dismissal (SUF ¶ 58), thus ruling that a prima facie case had not been made that Aon was negligent or breached any duty in submitting the application to NU. The court denied NU's Motion for Directed Verdict, Motion for Mistrial and Amended Motion for Mistrial. (SUF ¶ 59.)

## ARGUMENT

Each of NU's claims is barred as a matter of law, and several are barred for multiple reasons. All claims except the contribution count are barred by res judicata (see Section A below). The negligence counts also fail because Aon owes no duty to NU as a matter of law (see Section B below). The statutory counts also fail because they are inapplicable to this case (see Sections C and D below). Finally, the contribution count fails because Aon is not liable to IWG

---

expressed, the Court finds that the motion to file the cross-claim is untimely on the virtual, virtual eve of trial, so accordingly, for all the reasons argued by the opponents of the motion, the Court is going to deny AIG National Union's motion to file a cross-claim. (SUF ¶ 52.)

33949v1

as a matter of law (see Section E below). With no counts surviving scrutiny, Aon is entitled to summary judgment.

**I.     NU's Misrepresentation-Based Claims (Counts I-IV) Are Barred By Res Judicata.**

In its state court Verified Answer and Counterclaim, NU asserted both claims and defenses based on alleged material misrepresentations by Aon and/or IWG in the two submissions. (SUF ¶ 51.) The Court rejected these assertions. (SUF ¶ 56.) The doctrine of res judicata now precludes any new claims alleging misrepresentations in the submissions -- either against IWG or, as pertains to this case, or against IWG's agent, Aon. Counts I-IV (Negligence, Negligent Misrepresentation, Breach of Missouri Statute § 375.936, and Breach of New York Ins. Law § 349) all allege misrepresentation, and they are all therefore barred as a matter of law.

Res judicata bars the relitigation of claims or defenses that were brought or could have been brought in a prior case. O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357, 429 N.E. 2d 1158, 1159 (N.Y. 1981)[5]; accord Smith Trust & Sav. Bank v. Young, 312 Ill.App.3d 853, 858, 727 N.E.2d 1042, 1045-46 (Ill. App. Ct. 2000); Horton v. Caterpillar, Inc., 260 Ill.App.3d 150, 152-153, 632 N.E.2d 1061, 1063 (Ill. App. Ct. 1994). The test to determine whether a second claim is barred is whether the two actions are based upon a common core of operative facts. O'Brien, 54 N.Y.2d at 357, 429 N.E.2d at 1159; accord Bennett v. Gordon, 282 Ill.App.3d 378, 382-83, 668 N.E.2d 109, 112 (Ill. App. Ct. 1996) ("If the same facts are essential to maintain both proceedings or the same evidence is necessary to sustain the two, there is identity between the causes of action asserted, and res judicata bars the latter one.")

---

[5] Although the laws of the various states are similar, New York law should be applied on this issue. Illinois' choice of law principles examines which state's law has the most significant relationship with the occurrence by examining the (1) place of injury, (2) place where the injury-causing conduct occurred, (3) domicile of the parties, and (4) place where the relationship between the parties is centered. Fredrick v. Simmons Airlines, Inc., 144 F.3d 500, 503-04 (7th Cir. 1998). Here, the place of the alleged injury is at plaintiff's New York principal place of business, the decisions both to underwrite the policies and to deny coverage took place in New York, and the center of the relationship between Aon and NU is New York. This conclusion is consistent with NU s decision to base Claim V on a New York statute.

33949v1

Res judicata applies to the parties involved in the first action, as well as to the privies of parties, such as parties in a principal-agent relationship. Israel v. Wood Dolson Co., 1 N.Y.2d 116, 118 134 N.E.2d 97, 99 (N.Y. 1956) ("The doctrine, as generally stated, is that an existing final judgment rendered upon the merits by a court of competent jurisdiction, is binding upon the parties and their privies in all other actions or suits on points and matters litigated and adjudicated in the first suit or which might have been litigated therein."); accord Towns v. Yellow Cab Co., 73 Ill.2d 113, 122, 382 N.E.2d 1217, 1220-1221 (Ill. 1978).

Even if NU did not bring the precise legal claims in the state action that it alleges here, it could have done so, and that is sufficient to trigger the application of res judicata. See O'Brien v. City of Syracuse, 54 N.Y.2d at 357, 429 N.E. 2d at 1159; accord Smith Trust & Sav. Bank, 312 Ill.App.3d at 858, 727 N.E.2d at 1045-46; Horton, 260 Ill.App.3d at 152-153, 632 N.E.2d at 1063.

NU's complaint alleges that it sought leave to bring a cross-claim against Aon in the state court litigation and that its motion was denied, as if that avoided res judicata. (Complt. at ¶¶ 6, 7.) That is not the case. In the state court case, NU initially elected not to sue IWG's agent, Aon, and changed its mind only on the eve of trial. Since Aon had been a named defendant from the very first pleading and discovery had been closed for three months, it was predictable Judge Hall would deny NU's motion for untimeliness. (SUF ¶ 52.) Its decision to wait until the eleventh hour, whether strategic or negligent, is what barred NU from suing Aon in the state case. NU's attempt to add Aon shows it could have brought the instant allegations in the prior state court litigation but failed to so do, showing res judicata should bar Counts I-IV in this litigation.

## II. NU's Claims For Negligence (Count I) and Negligent Misrepresentation (Count II) Also Fail Because Aon Owed No Duty to NU.

NU's two negligence counts (Counts I and II) are based on the allegation that "[a]s an insurance broker, Aon owed a common law duty to National Union to supply correct and complete information to National Union and to make full disclosure of the risks involved in

7

issuing excess coverage to IWG." (Complaint at ¶¶ 24, 30.) That is incorrect. Aon owed no duty to NU as a matter of law, entitling Aon to summary judgment on these counts.

### A. As the Insured's Broker, Aon Owed No Duty to NU

Under New York law, insurance brokers owe a duty to their client, the insured, and <u>no duty</u> to the insurer. <u>Dorfman Organization, Ltd. v. Greater New York Mut. Ins. Co.</u>, 719 N.Y.S.2d 573, 573, 279 A.D.2d 437, 437 (N.Y. App. Div. 2001) ("Counterclaim-defendants, as the insurance broker for the proposed insured, owed the insured, not the counterclaim-plaintiff insurers, a duty of care."); <u>see also</u> <u>American Motorists Ins. Co. v. Salvatore</u>, 476 N.Y.S.2d 897, 900, 102 A.D.2d 342, 345 (N.Y. App. Div. 1984) (distinguishing between insurance broker, which is an agent for the insured and insurance agent, which is an agent for the insurer). In the absence of a duty of care, NU has no claim for negligence against Aon. <u>Petito v. Verrazano Contracting Co., Inc.</u>, 724 N.Y.S.2d 463, 464, 283 A.D.2d 472, 474 (N.Y. App. Div. 2001) ("In the absence of duty, there is no breach and without a breach there is no liability). Accordingly, Aon is entitled to summary judgment on Counts I and II.

### B. Judicial Estoppel Bars NU From Asserting That Aon Was Its Agent

Even if New York law were not clear that, as IWG's agent, Aon owed no duty to NU, the doctrine of judicial estoppel (also known as the doctrine of estoppel against inconsistent positions) mandates the same conclusion. The U.S. Supreme Court first articulated the doctrine of judicial estoppel in the seminal case, <u>Davis v. Wakelee</u>, 156 U.S. 680 (1895), holding that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." <u>Id.</u> at 689.

In the half century after <u>Davis v. Wakelee</u>, New York was the leading jurisdiction to develop and apply the doctrine of judicial estoppel. Thus, <u>The Doctrine of Preclusion Against Inconsistent Positions in Judicial Proceedings</u>, 59 Harv. L. Rev. 1132, 1132-36 (1946) (Ex. B), cited eight New York cases, more than from any other state. The note summarized the rule as

8

precluding a party from "framing his . . . pleadings in a manner inconsistent with a position taken in a prior proceeding" and concluded that the rule "rests upon the principle that a litigant 'should not be permitted . . . to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise.'" Id. at 1132.

The article noted a split of views as to whether a party must have actually succeeded in the prior case in order to trigger the estoppel. New York was cited as the leading authority for the proposition that success in the prior action was not a prerequisite. Id. at 1135 ("Other courts [such as New York courts], emphasizing the fact that the purpose of the doctrine is to prevent 'blowing hot and cold' and wasting the time of the court, have reached a contrary result [and do not require success in the first action], at least where the purposes of the two suits were not too disconnected.") (citing Houghton v. Thomas, 220 A.D. 415, 422 (N.Y. App. Div. 1927)).

This principle preventing litigants from "blowing hot and cold" was affirmed in 1984 in Environmental Concern Inc. v. Larchwood Construction Corp., 476 N.Y.S.2d 175, 101 A.D.2d 591, 593-94 (N.Y. App. Div. 1984), which has since been cited over forty times on the issue of judicial estoppel. Under Environmental Concern and its progeny, a party is barred by the doctrine of judicial estoppel from taking a position in one action that is contrary to a position it took in a prior action, regardless of whether the estopped party ultimately prevailed on the merits in the prior action. Id.; D&L Holdings v. RCG Goldman Co., 734 N.Y.S.2d 25, 30-32, 287 A.D.2d 65, 72 (N.Y. App. Div. 2001). Illinois is similar, Barack Ferrazzano, Kirschbaum Perlman & Nagelberg v. Loffredi, 2003 WL 21360629, at * 5-8 (Ill. App. 1st Dist. June 12, 2003) (Ex. C).

In the state court litigation, in order to impute statements by Aon to its principal, IWG, NU asserted that Aon was the agent of IWG. Indeed, NU insisted upon a stipulation that Aon was solely the agent of IWG. (Ex. D, Trial Tr. 2546-49.)

> MR. CARROLL [Counsel for NU]: Is Mr. Elden willing to stipulate that Aon Risk Services of Missouri was the agent of Hicks, Muse, Tate & Furst and International Wire Group in connection with both submissions?

33949v1

. . . .

MR. CARROLL: You're asking me to cut off my examination of the witness. I'm asking for a simple stipulation that Aon Risk Services of Missouri was the agent for Hicks, Muse, Tate & Furst and IWG in connection with the two submissions.

. . . .

MR. ELDEN [Counsel for Aon]: Your Honor, in terms of the agency issue, I am prepared to stipulate with AIG if they're prepared to stipulate with us that we were solely the agent of IWG for all purposes – all issues between AIG and us. Obviously IWG has a completely different interest here, but if that makes Mr. Carroll's life easier, we're willing to do that.

. . . .

MR. ELDEN: I am prepared to stipulate on behalf of Aon that we acted as agent for IWG and not as agent for AIG at all relevant times if AIG enters into the same stipulation, but my understanding is that would only bind the two of us. I'm not in any position to stipulate for IWG.

. . . .

MR. CARROLL: So as between Aon and AIG we have that stipulation, and I will agree to what Mr. Elden proposed.

MR. ELDEN: So stipulated.

(Ex. D, Trial Tr. 2546-49.)

NU obtained a direct benefit from the position that Aon was IWG's agent: NU was able to offer statements by Aon employees as admissions of IWG:

MR. CARROLL: Your Honor, I'd like to deal with the following exhibits. . . . It's Exhibit 1436, Exhibit 1459, Exhibit 1460, Exhibit 1462, Exhibit 1463, Exhibit 1464 and Exhibit 1467.

. . . .

THE COURT: All right, all of those have been admitted with respect to Aon?

MR. CARROLL: That's correct, your Honor. I am now moving their admission against IWG, and I'm going to lay the foundation for you, Judge, from the transcript and from the law. On January 14, 2003, beginning on page 3616 of the transcript of this court --

. . . .

33949v1

MR. CARROLL: Line 20: "Plaintiff International Wire Group, Inc. ("IWG"), and Defendants Aon Risk Services of Missouri ("ARS"), and Aon Corporation ("Aon"), by and through their undersigned attorneys, hereby stipulate to the following additional facts: 1. ARS was the insurance broker that placed primary insurance coverage for IWG and excess umbrella coverage for Hicks, Muse, Tate & Furst, Inc. ("Hicks Muse"), and its affiliates, including IWG and Viasystems, Inc." Now, that's an admission that ARS was, one, employed as the insurance broker to place both primary insurance and excess umbrella coverage. Ms. Becker testified --

THE COURT: That's a stipulation --

MR. CARROLL: That is a stipulation, your Honor, that appears on page 3617 of the transcript. Ms. Becker testified that she was a senior vice president of ARS. She also testified that she participated in the placement of primary insurance and excess insurance for Hicks, Muse, Tate & Furst. In connection with her employment responsibilities, she sent a series of memoranda to various underwriters during the course of her employment and within the scope of employment for which ARS was engaged by IWG and Hicks, Muse, Tate & Furst. Accordingly, ARS and Ms. Becker made admissions on behalf of IWG. With respect to Section 802.9 of Cleary & Graham's handbook of Illinois evidence, "In order to be required to be an admission, does the statement concern a matter within the scope of the agency or employment and that the agent or servant still be employed at the making of the statement," citing Halleck versus Coastal Building Maintenance Company, 269 Ill. App. 3d 887, a 1995 case. Accordingly, your Honor, I would move for the admission of exhibits previously identified as admissions against IWG.

. . . .

THE COURT: All right, I'm going to admit it. . . . She was trying to get insurance for IWG making statements that she thought were necessary to be made from whatever source she got it in order to get the insurance.

(Ex. E, Trial Tr. 5431-38.)

Because NU asserted in the state court litigation that Aon was solely IWG's agent, NU is estopped from claiming in this litigation that Aon was NU's agent.

In the absence of an agency relationship, Aon owed NU no duty of care referenced in the complaint. In the absence of a duty of care, NU has no claim for negligence against Aon. Petito v. Verrazano Contracting Co., Inc., 724 N.Y.S.2d 463, 464, 283 A.D.2d 472, 474 (N.Y. App. Div. 2001) ("In the absence of duty, there is no breach and without a breach there is no liability"). For this additional reason, Aon is entitled to summary judgment on Counts I and II.

33949v1

**III.  NU's Breach Of Missouri Statute § 375.936 Claim (Count III) Also Fails As A Matter of Law Because The Statute Provides No Private Right of Action.**

Count III of NU's complaint alleges a violation of Missouri Rev. Statute § 375.936.  The statute explicitly provides:  "Nothing in sections 375.930 to 375.948 shall be construed to create or imply a private cause of action for a violation of sections 375.930 to 375.948."  Mo. Rev. Stat. § 375.930.  Accordingly, courts regularly hold that Section 375.936 "does not allow a private cause of action for alleged violations."  Wenethe v. Willis Corroon Corp., 932 S.W.2d 791, 797 (Mo. Ct. App. 1996) (upholding summary judgment on the ground that §§ 375.930-.948 provide no avenue for private enforcement); see also Liberty Life, 853 F.2d at 593 (overturning trial court's award of damages on this ground); Tufts v. Madesco Inv. Corp., 524 F. Supp. 484, 486 (D. Mo. 1981) (dismissing § 375.936 claim because "the Missouri statute in question does not provide plaintiff with a private right of action").  Missouri's Director of Insurance is alone vested with the exclusive authority to investigate claims of deceptive practices by insurers.  Mo. Rev. Stat. § 375.938; Liberty Life Ins. Co. v. Schaffer, 853 F.2d 591, 593 (8th Cir. 1988).  With no private right of action permitted under the statute, Aon is entitled to summary judgment on Count III.

**IV.  NU's Breach of New York Ins. Law § 349 Claim (Count IV) Fails As A Matter Of Law Because The Referenced Statute Does Not Exist And Because New York Gen. Bus. Law § 349 Only Applies To Consumer-Related Transactions.**

NU alleges a breach of "New York Ins. Law § 349."  (Complaint at p. 10.)  No such statute exists, and on that basis alone Aon is entitled to summary judgment on Count IV.

If NU tried to rely on New York Gen. Business Law § 349, NU would nevertheless fail.  "Private contract disputes, unique to the parties, would not fall within the ambit of [General Business Law § 349]."  Schunk v. New York Cent. Mut. Fire Ins. Co., 655 N.Y.S.2d 210, 213, 237 A.D.2d 913, 915 (2001).  For example, Genesco Entertainment v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1977), granted summary judgment on a § 349 claim because the only parties that were affected by the transaction in question were the plaintiffs and the defendants and "a breach

of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, is not an act or practice affecting the public interest." Id.; accord, National Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 689 (S.D.N.Y. 1991); see also Morris v. Gilbert, 649 F. Supp. 1491, 1496-97 (E.D.N.Y. 1986) (describing typical violations of General Business Law § 349 as involving individual consumers who fall victim to misrepresentations made by sellers of consumer goods and applying to transactions where the amount in controversy is very small).

In particular, New York cases repeatedly refuse to apply General Business Law § 349 to insurance disputes. Fekete v. GA Insurance Co. of N.Y., 279 A.D.2d 300, 300, 719 N.Y.S.2d 52, 52 (2001) (refusing to permit amendment to add §349 claim on the ground that "[p]rivate contract disputes regarding policy coverage and the processing of a claim that is unique to the parties does not fall within the ambit of General Business Law §349"); Sheth v. New York Life Ins. Co., 273 A.D.2d 72, 73, 709 N.Y.S.2d 74, 75 (2000) (dismissing § 349 claim because the alleged practices were directed only at prospective insurance agents and § 349 is "intended to protect consumers, that is, those who purchase goods and services for personal, family or household use").

In this case, the dispute between NU and Aon is unique to the parties and affects no consumers. The case involves a complex set of facts surrounding a large-scale commercial transaction, and the amount in dispute exceeds $50 million. NU is not a consumer, the sole group protected by General Business Law § 349.

## V. NU's Contribution Claim (Count V) Fails As A Matter of Law Because Aon Is Not Liable to IWG.

Finally, NU claims that it has a right of contribution from Aon "in proportion to its share of common liability" to IWG. (Complaint ¶ 48.) This claim fails under collateral estoppel principles because the state court has already ruled that Aon is not liable to IWG. (SUF ¶ 58.)

A claim for contribution lies when two or more parties are alleged to be liable for damages for the same injury. Comi v. Breslin & Breslin, 683 N.Y.S.2d 345, 348, 257 A.D.2d

754, 756 (N.Y. App. Div. 1999). The critical requirement "is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." Raquet v. Braun, 681 N.E.2d 404, 407, 659 N.Y.S.2d 237, 240 (1997).

NU is collaterally estopped from asserting that Aon breached any duty to IWG. See Talarico v. Dunlap, 177 Ill.2d 185, 191, 685 N.E.2d 325, 328 (1997) (holding that collateral estoppel bars relitigation of claims adjudicated in prior proceeding). In the state court litigation, IWG alleged negligence and breach of fiduciary duty against Aon. After a three-month trial in which IWG failed to make even its prima facie case, Judge Hall granted Aon's Motion for Directed Finding and Order of Dismissal. (SUF ¶ 58.) Because Aon is not liable to IWG, NU's contribution claim fails as a matter of law, and Aon is entitled to summary judgment on Count V.

## **CONCLUSION**

For the foregoing reasons, each of NU's claims is fatally flawed as a matter of law for one or more reasons. Accordingly, Aon Risk Services and Aon Corporation are entitled to summary judgment.

33949v1

Dated: August 22, 2003

Respectfully submitted,

AON RISK SERVICES OF MISSOURI,
INC. AND AON CORPORATION

By: *Laura K. McNally*
One of their attorneys

Gary M. Elden
David E. Plunkett
Laura K. McNally
Patrick R. Malone
Grippo & Elden
227 W. Monroe, Suite 3600
Chicago, IL 60606
Phone: 312/704-7700

Douglas R. Stevens
R. Bruce Slocum
Aon Center
200 East Randolph Street, 8th Floor
Chicago, IL 60601
Phone: 312/381-5155

15

33949v1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, )
                                    )
    Plaintiff, )           Case No. 03 C00065
                                    )
      v. )           Judge Bucklo
                                    )
                                    )           Magistrate Judge Bobrick
AON CORPORATION AND AON RISK )
SERVICES OF MISSOURI, )
                                    )
    Defendants. )

## AON'S STATEMENT OF UNDISPUTED FACTS

Aon Corporation and Aon Risk Services of Missouri, Inc. submits the following statement of undisputed facts:

## I.    The Parties

    1.    Aon Corporation is a holding company for various operating subsidiaries, including ARS. (Ex. A, Finding 13.)

    2.    ARS is a retail broker of insurance, and acted as the broker of record for Hicks, Muse, Tate & Furst ("Hicks Muse"), and its subsidiary, International Wire Group ("IWG.") (Id.)

    3.    NU issued the two annual umbrella insurance policies at issue in this case covering the period April 1, 2000 through April 1, 2002. (Ex. A, Finding 17.)

## II.    History of the Hose Claims

    4.    IWG and its subsidiaries and predecessors manufactured water inlet hoses for washing machines manufactured by Whirlpool Corporation and General Electric Company (collectively, the "OEMs") from the 1950s through the mid-1990s. (Ex. A, Finding 28-30.)

33949v1



5.     Some of these hoses proved defective, causing damage to homeowner properties and resulting in subrogation claims against IWG by homeowner insurance carriers. (Ex. A, Findings 32-34.)

6.     In 1996 and 1998, IWG entered into Claim and Litigation Management Agreements with Whirlpool and General Electric ("OEMs"), respectively, which confirmed IWG's indemnification obligations to the OEMs under purchase order contracts and obligated the OEMs to pay IWG a percentage of claim payments, up to specified annual dollar caps. (Ex. A, Findings 47-49.)

7.     The direct effect of these agreements was to limit IWG's liability by transferring some of the hose claim liability to the OEMs. (Id.)

8.     Because of the large number of hose claims asserted against IWG in the early and mid-1990s, its primary insurance carriers required that IWG assume a large self-insured retention ("SIR") for hose claims beginning in 1997. (Ex. A, Finding 54.)

9.     A self-insured retention is the portion of the risk that the insured is required to pay on its own before the primary carrier's coverage is triggered. (Ex. F, Gloriod 128:18-22; Ex. G, Quigley 145:10-16.)

10.     During the 2000 and 2001 policy periods, IWG's SIRs for hose claims were $3.5 million and $4 million, respectively. (Ex. A, Finding 54.)

11.     IWG also addressed the hose claim problem by booking corporate reserves based on losses the company expected to pay in the future – i.e., losses for which IWG and not its insurers would be liable. (Ex. H, Tr. 4007:9-4008:21.)

12.     In 1996, IWG booked a $4.2 million reserve for these losses. (Ex. H, Tr. 4008:23-4010-21.)

13.     After the amount of claims did not decrease as expected in 1999, IWG reserved an additional $3.0 million relating to these claims. (Ex. A, Finding 54.)

33949v1

14.     IWG's publicly-available 1999 10-K disclosed all of these reserves and explained that there were uncertainties associated with the hose claims that could increase IWG's ultimate liability. (Id.)

15.     In the following year's 10-K, IWG reiterated that its liability could be greater than anticipated and disclosed that it had increased the reserve by an additional $3.0 million in 2000. (Id.)

16.     According to the 2000 10-K, as of December 31, 2000, the total hose claim reserve was $5.1 million. (Id.) At trial, Andrew Barberis of AIGTS (the individual who made the final call to deny coverage), testified that he was unaware of NU underwriting protocols that required underwriters to review applicants' 10-K reports (Ex. H, Trial Tr. pp. 983-90) and was unaware that Brian Shea, the underwriter on the 2001 submission regularly reviewed applicants' SEC filings on the Free Edgar website (Ex. I, Shea Dep., p. 11.). Had NU reviewed IWG's 10-Ks, it would have learned of the company's hose claim reserves.

## III.    ARS' Preparation of the Submissions

### A.    The 2000 Submission

17.     The ARS 2000 submission for umbrella coverage for Hicks Muse and its subsidiaries, including IWG, contains a "plethora of information regarding the existence and extent of the hose claims." (Ex. A, Finding 197.)

18.     Most dramatically, the submission contained a three-page narrative describing the background and extent of the hose claims against IWG, as well as the substantial SIR relating only to hose claims. (Ex. A, Findings 97, 198.)

19.     Included in the narrative were statements about how the claims had increased since 1990, how IWG was aggressively defending the hose claims, and how IWG had involved washing machine manufacturers in tracking and handling the claims. (Ex. A, Finding 97.)

20.     Of the nearly 100 Hicks Muse companies described in the submission, IWG is one of the companies with a claim or litigation issue described at all, let alone in great detail.

(Ex. J, Tr. 1666:6-1669:2.) No other Hicks Muse company had such an extensive description of a claim or litigation issue. (Ex. K, Trial Exhibit 1, p. ARSMO 00804.)

21. The Summary of GL Losses in the submission provided a list of paid and incurred insured claims for each of the prior five policy years. (Ex. A, Finding 98.)

22. In keeping with an accepted practice in the industry, the data for this chart was obtained from the relevant primary carriers for each year. (Ex. A, Findings 98, 99, 102.)

23. NU underwriters knew that loss data could be presented in this way and were so instructed by a collection of material called the "Workbench" which was online and followed the DBG Business Practice, except for exceptions for AIG Excess Indemnity. (Ex. A, Finding 99.)

24. The underwriters at American Home Assurance Company, which underwrote the policies for NU, were informed specifically that loss information can be presented to the underwriter in many formats, and that an underwriter may see loss reports that are generated by other insurance carriers. (Ex. A, Finding 102.)

25. NU underwriting guidelines specifically direct that underwriters are to inquire as to whether the loss data reflects first dollar losses; no such inquiry was made regarding this submission. (Id.)

26. The 2000 submission also discusses the hose claims in the Summary of Losses $50,000 or Greater. (Ex. A, Finding 100.)

27. The hose claims were included on that table as a single aggregated claim noting that there was "no individual claim exceeding $50,000." (Id.)

28. The hose claims were included in this summary even though up to that point no hose claim has ever exceeded $50,000 (Ex. L, Tr. 1658:2-1662:3).

29. The 2000 submission also provided information regarding the claims management agreements with General Electric and Whirlpool. (Ex. A, Finding 97.)

30. In a section entitled "History of Claims," the IWG narrative explained that after the hose claims increased throughout the 1990s, "[t]he Company [IWG] then adopted a more aggressive posture and began to involve the manufacturer of the hose being supplied to the

4

company and the manufacturer of the end product washing machines. These other companies began helping in payment and tracking of claims." (Ex. K, Trial Ex. 1, p. ARSMO 00804.)

31. NU was aware of the large SIR specifically for hose claims. (Ex. A, Finding 198.)

32. The schedule of underlying insurance provided by Aon set forth IWG's SIR for both hose ($3.5 million) and non-hose ($500,000) claims. (Ex. M, Trial Ex. 12, p. S&C 02837.)

33. After evaluating the risks faced by Hicks Muse and IWG, an underwriter in American Home's New York office made the decision to bind the policy for the April 1, 2000 to April 1, 2001 policy period. (Ex. N, Rountree Dep., pp. 28, 77.)

**B.    The 2001 Submission**

34. ARS' submission for coverage in 2001 closely tracked the information provided in the 2000 submission in the Summary of GL Losses and Losses of $50,000 or greater. (Ex. O, Tr. 1680:10-1681:25.)

35. The main difference relating to IWG was the narrative, which was rewritten and included no reference to the hose claims. (Ex. P.)

36. The 2001 submission was being sent to the same company that underwrote the 2000 policy, and indeed the same underwriter who had closed the final terms of the 2000 policy, who already had all of the information from the prior year's submission. (Ex. Q, Morkre Dep., p. 76 ("On a renewal, we would have the benefit of last year's application to give us a background. And the renewal application would typically be an update of information, not necessarily repeating everything that was originally submitted.").)

**IV.    The State Farm Suit and NU's Investigation and Coverage Decisions**

37. Prior to the inception of the NU policies, the number of hose claims appeared to be down from prior years, and at a steady level, and the potential exposure from such claims was below IWG's SIRs. (Ex. A, Finding 39.)

5

33949v1

38.     At that time, IWG believed that the number and dollar value of claims would likely go down in the future. (Ex. A, Findings 40-42.)

39.     On June 4, 2001, however, State Farm filed suit against IWG and others alleging damages in excess of $20 million for hose claims. (Ex. A, Finding 107.)

40.     IWG learned about the State Farm claims on June 11, 2001, and thereafter notified NU of the new hose claims and the potential that they might reach NU's coverage layer. (Id.)

41.     In July 2001, AIG Technical Services, Inc. ("AIGTS") in New York, on behalf of NU, began investigating whether NU should deny coverage on the basis of material misrepresentations and omissions in the formation of the policies, and the doctrine of known loss. (Ex. A, Finding 111.)

42.     The investigation included AIGTS reviewing various documents in New York and St. Louis; communications between Aon, AIGTS and IWG; and a meeting between the three entities in New York on August 21, 2001 (Ex. A, Findings 108-121).

43.     Following its investigation, AIGTS repeatedly told Aon and IWG that the coverage issues had been resolved. (Ex. A, Findings 121-129.)

44.     Thereafter, NU (through AIGTS) asserted rights under its policies and assumed the defense of the hose claims from IWG. (Ex. A, Findings 124-31, 153-54.)

45.     Despite its statements and conduct indicating that it would provide coverage for the hose claims, NU filed suit in New York on January 28, 2002 against Hicks Muse. (Ex. A, Finding 155.)

46.     The next day, January 29, AIGTS in New York sent a letter to IWG denying coverage. (Ex. A, Finding 156.)

47.     Prior to that date AIGTS had never sent a reservation of rights letter to IWG or Hicks Muse. (Ex. A, Findings 155-56.)

## V.      The State Court Litigation

### A.      The Parties' Claims

48.      On February 1, 2002, IWG filed its complaint in Cook County Circuit Court seeking, in Count I, injunctive relief requiring NU to satisfy its duty to defend hose claims against IWG.  (Ex. R, p. 14.)

49.      IWG also sought a declaratory judgment that NU is obligated to provide indemnification and defense to IWG with respect to all hose claims during the coverage periods of the NU's policies.  (Ex. R, p. 14.)

50.      In the event that NU was found not to have these obligations, IWG claimed that Aon was negligent and breached its fiduciary duty in failing to obtain coverage.  (Ex. R, p. 22-23.)

51.      In response, NU asserted counterclaims based on alleged material misrepresentations by Aon and/or IWG in the two submissions:

> 25.  <u>AON Risk did not disclose</u> in the submission materials it prepared . . . the existence of the indemnity agreements IWG entered into with the OEMs . . . . National Union issued Policies with certain terms regarding the existence of indemnitees without knowledge of the Agreements.  National Union would not have written the Policies if the existence of the agreements was disclosed.  (Ex. S, p. 46.)

> 26.  IWG and/or Hicks Muse made certain misrepresentations in the submission materials regarding the extent of the hose claims. . . .  National Union's underwriter viewed the omission of the Agreements as material.  The Policies would not have been issued if the existence of the agreements and/or the extent of the washing machine hose claims was disclosed.  (Ex. S, p. 46.)

> 49.  Upon information and belief, Hicks Muse, IWG <u>and their brokers and agents</u> deliberately and intentionally omitted material information regarding the extent and nature of the underlying hose claims and the existence, terms and conditions of the Agreements.  (Ex. S, p. 50.)

> 50.  Upon information and belief, the intentional failure and omission by Hicks Muse and/or IWG <u>and/or their agents</u> to disclose all hazards, including those referenced in the Agreement as of the inception dates of the Policies, constitutes a breach of the Policies.  (Ex. S, p. 50.)

51. National Union therefore seeks a declaration that the intentional omission of material information in the insurance application/submission process regarding the extent and nature of the underlying hose claims by Hicks Muse and/or IWG and/or their agents constitutes a material misrepresentation. As such, National Union should be allowed to void the Policies. (Ex. S, p. 50.)

52. National Union seeks a declaration that the intentional omission of material information in the insurance application/submission process by Hicks Muse and/or IWG and/or their agents precludes coverage for IWG as an additional insured as well as precludes enforcement by Hicks Muse and/or IWG of the SEPARATION OF INSUREDS provision in the Policies. On information and belief, IWG provided information to the broker hired by Hicks Muse about the defective hose claims which it knew to be false and misleading. (Ex. S, p. 50.)

In addition to these claims, NU asserted the following affirmative defense based on the alleged misrepresentations:

Nineteenth Affirmative Defense: IWG's claim is barred because of IWG and/or its agents' material misrepresentations and omissions in the insurance applications/submissions for the Policies." (Ex. S, p. 40.)

**B.     NU's Admission That the Operative
        Facts Here Have Already Been Litigated**

52.     On the eve of trial, NU attempted to add a cross-claim against Aon that closely tracked its claims in this action, which was denied as untimely.[6] (Ex. T, Tr. of 11/01/02 hearing, p. 23.)

53.     NU acknowledged during argument on this issue that the operative facts in the prior state court action were the same as in the proposed counterclaim against Aon:

_____

[6] THE COURT: With respect to the motion to file the cross-claim by AIG National Union against AON, the Court will deny that motion. It is apparent that there's a lot involved, and that's why the briefing and arguments that the Court has received concerning the nature of such a filing of a cross-claim and the nature of this possible action by AIG against AON, the scope of that action, what might be involved in it, have been very useful to the Court in order for the Court to exercise its discretion. It is literally the day before trial, and for all of the reasons expressed, the Court finds that the motion to file the cross-claim is untimely on the virtual, virtual eve of trial, so accordingly, for all the reasons argued by the opponents of the motion, the Court is going to deny AIG National Union's motion to file a cross-claim. (Ex. T, Tr. of 11/01/02 hearing, p. 23.)

8

As we discussed before, our cross-claim against AON follows and mirrors the allegations that are pled by IWG against AON. The essential issues here are the same, the facts are the same. We've had 50 depositions on these issues. They've had their own expert Mr. Kensicki who has opined and said he's prepared to provide opinions as to the standards and practices and procedures of a broker submitting submissions to insurance companies.

(Ex. U, Tr. of 11/01/02 hearing, p. 5.)

### C.     <u>The Trial and Judgment</u>

54.     Trial commenced on November 4, 2002 and continued through January 31, 2003. (Ex. A, Finding 8.)

55.     On July 24, 2003, the state court issued its 76-page ruling, together with 266 Findings of Fact and Conclusions of Law. (Ex. A.)

56.     The court ruled on multiple alternative grounds that NU is obligated to defend and indemnify IWG for the hose claims during its policy periods. (<u>Id.</u>, p. 76.)

57.     The court also awarded IWG its reasonable attorneys' fees, to be paid by NU and AIGTS. (<u>Id.</u>, pp. 74-75.)

58.     As to Aon, the Court granted its Motion for Directed Finding and Order of Dismissal (<u>Id.</u>, p. 76.), thus ruling that a <u>prima facie</u> case had not been made that Aon was negligent or breached any alleged duty.

59.     The court denied the NU/AIGTS Motion for Directed Verdict, Motion for Mistrial and Amended Motion for Mistrial. (<u>Id.</u>)

33949v1

## CERTIFICATE OF SERVICE

I, Laura K. McNally, certify that on August 22, 2003, I caused a true and complete copy of the foregoing Aon's Motion for Summary Judgment to be served via messenger delivery, to the following address:

> Matthew Fink, Esq.
> Nina Markoutsis, Esq.
> Bates & Carey
> 333 West Wacker Drive
> Suite 900
> Chicago, IL 60606

*Laura K. McNally*

Laura K. McNally